IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**JIMMY DAVIDSON**     **PLAINTIFF**

v.     **No. 3:18CV18-JMV**

**WARDEN TIMOTHY OUTLAW, ET AL.**     **DEFENDANTS**

**MEMORANDUM OPINION**

This matter comes before the court on the *pro se* prisoner complaint of Jimmy Davidson, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act ("PLRA"), the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that he broke his hip while getting down from his bunk, and defendant Nurse Gale would not provide medical treatment unless he walked on his broken hip to get to the transport vehicle. The defendant has moved [49] for summary judgment, arguing that the plaintiff failed to exhaust his administrative remedies before filing suit. The plaintiff has responded to the motion, and the matter is ripe for resolution. For the reasons set forth below, the defendant's motion will be granted, and the instant case will be dismissed without prejudice for failure to exhaust administrative remedies.

**Factual Allegations**

On November 15, 2014, Jimmy Davidson, who was housed at the Marshall County Correctional Facility in Holly Springs, Mississippi, requested placement in a bottom bunk because of his age (51) and deteriorating joints. Warden Timothy Outlaw ignored this request. Case Manager

Jones denied his request, stating that she did not do in-house movements. Unit Sergeant Mildred stated that she would take care of the problem, but she never did.

On December 20, 2014, the plaintiff slipped while climbing down from the top bunk to go take a shower – leaving him in excruciating pain from a fractured hip. A few minutes later, a guard came by for count, and Davidson told him to send for medical staff. Two hours later, Nurse Hill and another nurse arrived with a wheelchair and transported him to medical. Nurse Hill caused the plaintiff pain while lifting him onto the examination table at medical. The nurses called for the doctor, but had to wait 90 minutes for a response. The doctor said to give Mr. Davidson some pain medication, return him to his housing unit, then transport him back to medical in the morning. The medical staff gave him a shot for pain and wheeled him back to his housing unit.

Medical staff did not return the next morning, December 21, 2014. Davidson asked Sgt. Mildred when she came by that morning to please have his breakfast brought to his cell because he could not walk. She stated that she would bring him a breakfast tray that time, but would not do so for future meals. Davidson ate breakfast that day but had to skip lunch because medical had not yet arrived. Case Manager Lang told Sgt. Mildred that Davidson needed to fill out an inmate request form to inform medical of the seriousness of his injury so he could take his meals in his cell. He filled out a request, passed it to Sgt. Mildred, and did not see her again that day.

At 4:20 p.m. medical still had not arrived, and Davidson was in terrible pain. Officer Moore told Davidson that medical had arrived and that he needed to walk up front so they could transport him. He told the officer that he could not walk at all and requested a wheelchair. Medical refused to send a wheelchair, informing him that if he wanted an x-ray, he must walk up front to meet them. Davidson offered to send someone from his unit up front to retrieve a wheelchair, but medical refused, again stating that he must walk up front to be x-rayed. Officer Moore informed Davidson that Nurse

- 2 -

Gale was the one demanding that he walk up front with an injured hip. As he could not even stand, much less walk, he declined to do so. He did not get a meal tray that day.

That night his cell mate brought him an eating bowl to relieve his bladder because he could not get up to do so himself. He did not get a meal tray the next morning (December 22, 2014) – because he could not get out of bed, and dining staff would not bring a tray to his cell. At 9:30 a.m. on December 22, 2014, medical sent for Davidson, and he again told them that he could not walk – and requested a wheelchair. An hour later, an officer arrived with a wheelchair and took him to medical. Soon after, Officer Boyd and another officer transported Davidson to the hospital in Holly Springs to be examined. He was taken directly to radiology to be x-rayed, and the nurse told them that there was a high probability that he would be transported to another hospital – and that a doctor would arrive soon. The nurses were waiting for instructions from the doctor.

After 30 minutes, Officer Boyd asked how long it would take, and the nurse said she was still waiting for the doctor, but that Davidson was definitely being transported to another hospital. Officer Boyd said that she was leaving with Davidson, but the nurse refused. Officer Boyd again said that she was leaving with Davidson, but two nurses intervened, and Davidson was transported to Baptist Hospital in DeSoto County. He got to eat breakfast there at 7:00 a.m., his first meal in two days. Three days later, December 25, 2014, doctors performed surgery, repairing his broken hip with two rods.

Davidson was transported to Parchman eight days later, and the doctors there changed the prescription for painkillers to something milder – which did not help much with the pain.

### The Grievance Process

Mr. Davidson alleges that he exhausted MCCF's grievance process as to this claim before filing suit. [Doc. 1] at 4. He alleges that he submitted two grievances, one before the fall and one after. *Id.* The

first grievance document attached to the complaint is dated November 15, 2014. *Id.* at 6. In it, Mr. Davidson requested to be "moved off of a top rack bed down to a bottom rack bed." *Id.* He stated that he "recently injured [his] knee jumping down" and contended it was "swolled somewhat and sore." *Id.* This document does not mention Nurse Gale or Davidson's medical care.

The second document is dated December 5, 2014. *Id.* at 7. Mr. Davidson complained that he had "to climb up and down from a top bed several times a day" and that on November 13, 2014, he jumped down and his "left knee bowed in . . . injuring [his] knee and causing it to swell up." *Id.* Davidson claimed that he previously informed his case manager of this injury and top-bunk assignment, requesting to be moved to a bottom bunk. *Id.* at 8. According to Davidson, his case manager directed him to submit the request to "the unit sergeant," "Ms. Mildred." *Id.* Davidson complained that the issue was never handled and requested "to be moved down to a bottom bed." *Id.* This document likewise does not mention Nurse Gale or Mr. Davidson's medical care.

The third document is dated December 21, 2014, and requests a "lay in tray from medical" due to Davidson's belief that he could not walk. *Id.* at 19. This document does not complain of Nurse Gale or his medical care.

The fourth document, dated January 10, 2015, again complained of Davidson's case manager and unit sergeant failing to move him to a bottom bunk. *Id.* at 10. He contended that he fell when getting down from the top bunk on December 20, 2014. *Id.* at 11. According to Mr. Davidson, he was taken to medical in a wheelchair, given pain medication, and returned to his unit. *Id.* Mr. Davidson complained of not receiving food trays during that time due to his alleged inability to walk. *Id.* at 12. In addition, Mr. Davidson contended that on December 21, 2014, he was called to medical and informed that he must walk there. *Id.* at 13. Mr. Davidson alleged that "officer more" told him that "nurse gail, in medical" was sending him "those messages on the phone." Mr. Davidson then complained of more instances of not receiving a food tray. *Id.* at 14.

According to Mr. Davidson, he did not receive responses to these documents. *Id.* at 4. However, none of the documents included with the complaint are stamped or signed as having been received by MCCF. Though Mr. Davidson alleges that he submitted the documents (including the one mentioning Nurse Gale from January 10, 2015), MCCF has no record of having received them. Hence, according to MCCF records, Mr. Davidson did not file any grievance related to his medical treatment during the relevant time period. *See* Affidavit of Jackie Collins, attached to Defendant's Motion as Exhibit A.

## Failure to Exhaust Administrative Remedies

The documents the parties have provided reveal that the plaintiff did not exhaust the prison grievance process before filing the instant suit. Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress meant for the exhaustion requirement to be an effective tool to help weed out the frivolous claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

*Jones v. Bock*, 549 U.S. 199, 203 (2007).

The PLRA requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); *see also Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir.2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The Supreme Court has also recognized the need for a prisoner to face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. Under this statutory authority, the Mississippi Department of Corrections has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. Nov. 6, 2000). On September 19, 2010, the ARP process was changed from three steps to two. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The two-step ARP process begins when an inmate first submits his grievance in writing to the prison's Legal Claims Adjudicator within thirty days of the incident. *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the grievance and determines whether or not to accept it into the ARP process. *Id*. The screening phase operates as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances. As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra*. Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as

exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion); *Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see also Robinson v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process). However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have five days from the date of rejection to file his/her corrected grievance.

*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf (last visited April 3, 2019)).

If accepted, the grievance is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate. *Howard, supra*. If the inmate is unsatisfied with the first response, he may continue to the Second Step by completing an appropriate ARP form and sending it to the Legal Claims Adjudicator. *Id*. The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response – which completes the ARP process. *Id*. Issuance of the Second Step Response is the only way to complete the grievance process. If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id*.

In this case, Mr. Davidson alleges that he never received a response of any kind regarding his January 10, 2015, grievance (the one mentioning Nurse Gale). He argues that the grievance

- 8 -

system is inefficient, in part because of high turnover in the personnel charged with handling the grievance process. However, as discussed above, it is his responsibility to follow up if the process appears to be stalled – and to reinitiate it, if necessary. As the defendant argued in her reply [57] in support of summary judgment, a plaintiff must not merely initiate the grievance process, but must see it through to its conclusion. The Southern District of Mississippi has cited the Fifth Circuit, upholding this rule in a case where the *pro se* prisoner plaintiff argued that his grievance was not processed in a timely fashion:

> According to Plaintiff, his ARP was not processed in a timely manner…. The requirement of exhaustion applies regardless of Plaintiff's opinion on the efficacy of the institution's administrative remedy program. *Alexander v. Tippah County, MS.,* 351 F.3d 626, 630 (5th Cir.2003). It is not for this Court to decide whether the procedures "satisfy minimum acceptable standards of fairness and effectiveness." *Booth,* 532 U.S. at 740 n. 5.

*Tompkins v. Holman*, No. 3:12CV87-LRA, 2013 WL 1305580, at *2 (S.D. Miss. Mar. 26, 2013).

Mr. Davidson has not alleged that he followed up with grievance personnel to ensure that his grievance completed the Second (final) Step of the process. Thus, he has not alleged that he was unable to pursue his grievance to conclusion, only that the grievance personnel did not process his grievance in a timely fashion. Indeed, he did not check to ensure that grievance personnel even received the grievance. Hence, the grievance process was available to him, but he did not pursue the matter to its conclusion.[1] For this reason, the plaintiff's claims regarding denial of medical care against Nurse Lorna Gale will be dismissed without prejudice for failure to exhaust administrative remedies.

---

[1] The court notes that, in prisoner cases, it receives copies of completed grievances of all types from MDOC facilities, including the Marshall County Correctional Facility, on an ongoing basis. Mr. Davidson has not alleged a reason why grievance processing staff at MCCF might single him out and refuse to process his four grievances, while properly processing innumerable others.

**Conclusion**

For the reasons set forth above, the defendant's motion [49] for summary judgment will be granted, and the instant case will be dismissed without prejudice for failure to exhaust administrative remedies. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 22nd day of June, 2020.

/s/   Jane M. Virden
UNITED STATES MAGISTRATE JUDGE